# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 22, 2013          Decided July 2, 2013

No. 12-5246

MORTGAGE BANKERS ASSOCIATION,
APPELLANT

v.

SETH D. HARRIS, SUED IN HIS OFFICIAL CAPACITY, ACTING
SECRETARY OF UNITED STATES DEPARTMENT OF LABOR, ET
AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00073)

---

*Michael W. Steinberg* argued the cause for appellant. With him on the briefs were *Sam S. Shaulson* and *David M. Kerr.*

*Anthony J. Steinmeyer*, Assistant Director, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Douglas N. Letter*, Director.

*Sundeep Hora* and *Adam W. Hansen* were on the brief for intervenors-appellees Jerome Nickols, et al.

Before: TATEL and BROWN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The tandem of *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) and *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999) ("*Alaska Hunters*") announced an ostensibly straightforward rule: "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish [under the APA] without notice and comment." *Alaska Hunters*, 177 F.3d at 1034. The only question properly before this three-judge panel is a narrow one: what is the role of reliance in this analysis?[1] Is it, as the government contends, a "separate and independent requirement," Oral Arg. 10:42–10:45, or is it just one of several factors courts can look to in order to determine whether an agency's interpretation qualifies as definitive,[2] as Mortgage Bankers Association ("MBA") suggests? We find ourselves in general agreement with the industry association that there is no discrete reliance

---

[1] Bound as we are by *Paralyzed Veterans* and *Alaska Hunters*, we decline the government's invitation to "call" for "the full Court [to] * * * lay the *Paralyzed Veterans* doctrine to rest." Letter of Clarification, No. 12-5246 (D.C. Cir. Mar. 25, 2013) (quoting Appellee Br. 47).

[2] Our case law uses the terms "definitive" and "authoritative" interchangeably. *Compare Paralyzed Veterans*, 117 F.3d at 586 ("authoritative interpretation"), *with Alaska Hunters*, 177 F.3d at 1034 ("definitive interpretation").

element. Reliance is just one part of the definitiveness calculus.

Fortunately, this is as far as our inquiry need go. Having conceded the existence of two definitive — and conflicting — agency interpretations, the government acknowledged at oral argument that petitioner "prevail[s] if . . . the only reason [courts] look to reliance is to find out if there is a definitive interpretation." Oral Arg. 10:56–11:10. So stipulated, we reverse the District Court order dismissing MBA's Motion for Summary Judgment and remand the case with instructions to vacate the 2010 Administrator Interpretation significantly revising the agency's 2006 Opinion Letter. If the Department of Labor ("DOL") wishes to readopt the later-in-time interpretation, it is free to. We take no position on the merits of their interpretation. DOL must, however, conduct the required notice and comment rulemaking.

**I**

Petitioner MBA is a national trade association representing over 2,200 real estate finance companies with more than 280,000 employees nationwide. *Mortgage Bankers Ass'n v. Solis*, 864 F. Supp. 2d 193, 197 (D.D.C 2012). We focus here on the mortgage loan officers who typically assist prospective borrowers in identifying and then applying for various mortgage offerings. Though the recent financial crisis has thrust members of this profession into the forefront of the news, our concern here is more mundane: the method and manner of their pay.

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, an old law DOL must adapt to new circumstances, employers are generally required to pay overtime wages to employees who work longer than 40 hours

4

per week. *See* 29 U.S.C. § 207(a). The Act provides several exceptions to this rule. Those "employed in a bona fide executive, administrative, or professional capacity[,] . . . or in the capacity of outside salesman," for example, are exempt from the statute's minimum wage and maximum hour requirements. 29 U.S.C. § 213(a)(1). Whether mortgage loan officers qualify for this "administrative exemption" is a difficult and at times contentious question. So difficult, in fact, DOL has found itself on both sides of the debate. In 2006, the agency issued an opinion letter concluding on the facts presented that mortgage loan officers with archetypal job duties fell within the administrative exemption. Just four years later, in 2010, Deputy Administrator Nancy J. Leppink issued an "Administrator's Interpretation" declaring that "employees who perform the typical job duties" of the hypothetical mortgage loan officer "do not qualify as bona fide administrative employees." J.A. 259. The 2010 pronouncement "explicitly withdrew the 2006 Opinion Letter." *Mortgage Bankers Ass'n*, 864 F. Supp. 2d at 201.

Citing *Paralyzed Veterans* and its progeny, MBA challenged DOL's decision to change their "definitive interpretation" without first undergoing notice-and-comment rulemaking as a violation of the APA. Compl. ¶ 38. **[J.A. 22]** The District Court rejected the argument. After assuring itself that *Paralyzed Veterans* remains good law, *see Mortgage Bankers Ass'n*, 864 F. Supp. 2d at 204–05, the court read our recent decision in *MetWest Inc. v. Secretary of Labor*, 560 F.3d 506 (D.C. Cir. 2009), to require a showing of "substantial and justifiable reliance on a well-established agency interpretation." *See id.* at 207 (internal quotation marks and emphasis omitted). Although petitioner had argued reliance in the alternative, the court concluded MBA was unable to "satisfy the standard for demonstrating reliance recognized in *MetWest*." *Id.* at 208. The court then denied

MBA's Motion for Summary Judgment, but not before dismissing the association's substantive challenge to the 2010 interpretation as inconsistent with the agency's 2004 regulation, 29 C.F.R. § 541.203(b). The present appeal followed.

## II

On its face, the *Paralyzed Veterans* analysis contains just two elements: definitive interpretations ("definitiveness") and a significant change ("significant revision").[3] But as with most things doctrinal, the devil is in the details.

Despite its age, few cases discuss *Paralyzed Veterans* at length.[4] One critical question — and a dispositive one here —

---

[3] The doctrine's operative assumption — the belief that a *definitive* interpretation is so closely intertwined with the regulation that a significant change to the former constitutes a repeal or amendment of the latter — is established law in this Circuit, *see, e.g.*, *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 997–98 (D.C. Cir. 2005), but the Courts of Appeals are split on the issue. According to one recent survey, the Fifth Circuit has adopted our approach and "the Eighth and Third Circuits have mentioned [it] in dicta," but "[t]he First, Second, Fourth, Sixth, Seventh, and Ninth Circuits agree that changes in interpretations do not require notice and comment because both the original and current position constitute interpretive rules." *Warshauer v. Solis*, 577 F.3d 1330, 1338 (11th Cir. 2009); *see also United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1138–39 (10th Cir. 2010) (noting a slightly different circuit split between the Third, Fifth, and Sixth Circuits on one hand, and the First and Ninth Circuits on the other).

[4] It need not reflect poorly on the doctrine that so few of our cases haven taken up *Paralyzed Veterans*'s banner — and still fewer have used its reasoning to invalidate an agency interpretation for failing to conduct notice and comment rulemaking. *See*

concerns the role of reliance. Borrowing heavily from *MetWest* and *Honeywell International, Inc. v. NRC*, 628 F.3d 568 (D.C. Cir. 2010), two recent cases that draw on our *Alaska Hunters* decision, DOL suggests that the *Paralyzed Veterans* analysis contains an independent third element: substantial and justified reliance. MBA takes a different approach to *Alaska Hunters* altogether. In its view, that case stands only for the proposition that reliance can elevate an otherwise non-definitive interpretation into a definitive interpretation; as such, it falls squarely within the existing definitiveness element. Of the two, we believe MBA's approach better explains *Alaska Hunters*.

*Alaska Hunters* is an exceptional case with an otherwise straightforward premise. In 1963, the Federal Aviation Administration's Alaska office (the "Alaskan Region") began a thirty year practice of "uniformly advis[ing] all guides, lodge managers and guiding services in Alaska that they could meet their regulatory responsibilities by complying with the requirements of [14 C.F.R. Part 91] only." *Alaska Hunters*, 177 F.3d at 1035. It was not until 1997 that officials in FAA's Washington, D.C. headquarters formally pushed back against the regional office's long-standing interpretation.[5] Through a "Notice to Operators" published in

Appellee Br. 40–41 (counting *Alaska Hunters* and arguably *Environmental Integrity Project* as the lone exceptions). *Paralyzed Veterans* may very well serve as a prophylactic that discourages agencies from attempting to circumvent notice and comment requirements in the first instance. We are unable to quantify these effects by reference to case citations alone.

[5] It is "uncertain" whether the D.C.-based officials had knowledge of the Alaskan Region's interpretive position prior to the 1990s — that is, before FAA consolidated power in its national headquarters following a near three-decade-long experiment with a

the Federal Register without notice and opportunity for comment, the agency announced that certain Alaskan guides would now have to comply with other, more onerous regulations. Individuals who had "opened lodges and built up businesses dependent on aircraft" in reliance on the Alaskan Region's interpretation promptly brought suit challenging the agency's about-face. *Id.* at 1035.

In relevant part, FAA argued *Paralyzed Veterans* was "inapposite" because the Alaskan Region's interpretation was not definitive; it "represented simply a local enforcement omission, in conflict with the agency's policy in the rest of the country." *Id.* at 1034–35. We disagreed. Although a local office's interpretation of a regulation or provision of advice to a regulated party "will not necessarily constitute an authoritative administrative position, particularly if the interpretation or advice contradicts the view of the agency as a whole," the situation in *Alaska Hunters* was "quite different." *Id.* at 1035.

For one thing, there was no evidence in the record of any conflicting interpretation. The Alaskan Region uniformly enforced its interpretive position for thirty years and both FAA and the National Transportation Safety Board had at some point referred to it as FAA policy. *See id.* at 1035. And even if "FAA as a whole somehow had in mind an interpretation different from that of its Alaskan Region, guides and lodge operators in Alaska had no reason to know this." *Id.* All the regulated parties had before them was the

---

decentralized organizational structure "that transferred much authority to regional organizations." *Alaska Hunters*, 177 F.3d at 1032.

formal,[6] uncontradicted, and uniformly-applied interpretation of a local office — an interpretation Alaskan guide pilots reasonably relied on for three decades. Such advice might not necessarily qualify as definitive, but here, we concluded, it "became an authoritative departmental interpretation, an administrative common law applicable to Alaskan guide pilots" that could not be rewritten without notice and comment rulemaking. *Id.*

*Alaska Hunters*'s takeaway is clear: reliance is but one factor courts must consider in assessing whether an agency interpretation qualifies as definitive or authoritative. Or to put matters more precisely, because regulated entities are unlikely to substantially — and often cannot be said to justifiably — rely on agency pronouncements lacking some or all the hallmarks of a definitive interpretation, significant reliance functions as a rough proxy for definitiveness. The converse also holds true. Agency pronouncements effectively ignored by regulated entities are unlikely to bear the marks of an authoritative decision. *See Ass'n of Am. R.R.*, 198 F.3d at 949–50 (finding no definitive interpretation in part because "[n]othing in th[e] record suggests that railroads relied on the [agency statements] in any comparable way" to the Alaska guides).[7] This is more art than science. Courts must weigh the

---

[6] "[T]he regional office's position was reflected in official agency adjudications holding that Alaskan guides need not comply with commercial pilot standards." *Ass'n of Am. R.R. v. DOT*, 198 F.3d 944, 949 (D.C. Cir. 1999).

[7] Obviously, this is not to suggest *any* measure of reliance will automatically render an interpretation definitive.

role reliance plays on a case-by-case basis to ascertain its value.

DOL pushes back against this framework by treating reliance as a separate and independent third element.[8] That, the agency claims, is exactly what our *MetWest* decision did in (1) addressing reliance only in the alternative, *i.e.*, after assuming a definitive interpretation, *see MetWest*, 560 F.3d at 510–11, and (2) speaking of *Alaska Hunters*'s "substantial and justifiable reliance on a well-established agency interpretation," *id.* at 511, a phrase "most natural[ly] read[]" to distinguish definitiveness and reliance as "separate

---

[8] The agency never develops the implications of its alternative vision, but we think two points obvious. First, by dissociating reliance from definitiveness and calling it an independent requirement, DOL believes courts will have to address the reliance issue in *all* cases, including cases like the present in which definitiveness has been established. Second, DOL assumes the third element would be satisfied only if the reliance is equal to or greater than that of A*laska Hunters*, a unique case. Meaning, the *Paralyzed Veterans* doctrine would only ever apply where the parties can demonstrate substantial and justified reliance *akin to that of the Alaska Guides* — a reliance interest the government describes as "especially strong" since affected parties uprooted their lives to move to Alaska to start businesses. Appellee Br. 19; *see also MetWest*, 560 F.3d at 511; *Mortgage Bankers Ass'n*, 864 F. Supp. 2d at 207 ("[T]his Court is convinced that *MetWest* intended to set the bar for what a plaintiff must establish to satisfy the reliance component of the *Paralyzed Veterans* doctrine."). If adopted, this position effectively renders *Paralyzed Veterans* dead letter law by limiting its application to a most extreme fact pattern — one unlikely to ever be duplicated.

requirements," Appellee Br. 23–24; *see also Mortgage Bankers Ass'n*, 864 F. Supp. 2d at 205–08.[9]

We do not think this characterization of *MetWest*'s dicta could possibly be correct. "Definitive" is a term of art as used in the *Paralyzed Veterans* context. Once a court has classified an agency interpretation as such, it cannot be significantly revised without notice and comment rulemaking. No intervening decision of this Court ever read *Alaska Hunters* to require anything to the contrary, and that includes *Association of American Railroads*, the lone pre-*MetWest* case DOL cites as having treated "reliance and definitive interpretation as two independent requirements." Appellee Br. 24.[10] Whether reliance played a significant role in the analysis, *see, e.g.*, *Alaska Hunters*, 177 F.3d at 1035–36; *Ass'n of Am. R.R.*, 198 F.3d at 950; or took a back seat where the definitive nature of the interpretation was treated as self-evident, *see Envtl. Integrity Project*, 425 F.3d at 998; *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001), we have always considered it as part of the first element. In short, we have been too consistent in our treatment of these so-called agency flip-flops to now read dictum in *MetWest* as *sub*

---

[9] Because *Honeywell* unceremoniously adopts *MetWest*'s language and approach, *see Honeywell*, 628 F.3d at 579–80, we focus our discussion primarily on *MetWest*.

[10] *See Ass'n of Am. R.R.*, 198 F.3d at 948 ("We find nothing in these materials, individually or taken together, that comes even close to the definitive interpretation that triggered notice and comment rulemaking in *Alaska Professional Hunters*."); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1041 (D.C. Cir. 2008); *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 56–58 (D.C. Cir. 2002); *Envtl. Integrity Project*, 425 F.3d at 997–98.

*silentio* reconfiguring the doctrine in the absence of either a unanimous *Irons* footnote or a decision of the en banc court.

Finally, we disagree with the suggestion that the only way to protect agencies from inadvertently locking in disfavored, informally promulgated positions is to impose a separate and independent reliance element. Practically speaking, reliance considered as part of the definitiveness determination will more than adequately protect agencies from this ossification threat. We thus decline DOL's invitation to spin a third requirement from whole cloth. Emphatically, that is an issue for the full Court to take up at its discretion, not this three-judge panel.

### III

In view of the government's concession that the case need go no further than this, we reverse the District Court order denying MBA's Motion for Summary Judgment and remand the case with instructions to vacate DOL's 2010 Administrator Interpretation.

*So Ordered.*